May it please the court, your honor, Andrew Van Ornem on behalf of Appellant Hartford Fire Insurance Company. Hartford is operating in the capacity of a surety in this case. I'd like to reserve four minutes for rebuttal if that's okay. This case arises out of a set-aside agreement between Hartford, the surety, and a bank, Westamerica Bank, on a subdivision development project in Northern California. The parties entered into this set-aside agreement, which is in a letter form. It's in a form that has been followed in the surety industry for at least fifty years since the City of Los Angeles v. Anchor Casualty case in 1962. You know, I hear counsel, I just don't want to throw you off your opening, but we hear that in insurance cases, too. Well, in the case of the Ninth Circuit, if you look at this contract and you interpret it contrary to what the person in your position is arguing, why you're undoing the work of all of these contracts that have used the identical phrase, and then you go to the phrase and it isn't quite as clear as a good draftsperson could make it. And I always have trouble being presented with the argument that says, well, because we've done this, and we're in the past so many times, and now we are here before you with a three hundred and fifty thousand dollar dispute, or whatever it is, and because we've always used this, you should go ahead and endorse it and interpret our way. My question is, why can't it be made clearer? I think that's the perspective that the district court judge took in deciding this case, but I don't think that properly applies the rules of interpretation, and I'm not going to argue that just because, under the facts of the City of Los Angeles case, ipso facto, all set-aside agreements are enforceable as I want. You can't, because the City of Los Angeles case was interpreting specific language in a specific contract, and as I read the City of Los Angeles case, it does not create a one-size-fits-all ruling. It's very much tied to the facts and language of that contract. It would be helpful if you could point out where your argument lies in the language of the contract. It sure does, Your Honor, and I'm happy to do that, and I will do it. I want to say that the error, I think, from the district court's decision was not considering the circumstances surrounding or the custom and usage of the set-aside agreement form, and maybe more specifically, the district court didn't consider the circumstances and this traditional form letter agreement to identify the purpose of this letter and its specific goal and role in this transaction. But that was... Just to make one final point on this, I agree that the district court appears not to have strictly followed California law. As I understand California law, what the district court and the party should have focused on is whether there's a plausible interpretation, being advanced by your side, that can be supportive of your position in light of the language and is what you're focused on is is there any ambiguity in the language that would then warrant taking extrinsic evidence, but the extrinsic evidence has to be predicated on the notion that there is, that the evidence itself creates the ambiguity, and that's why I would like you to look to the contract and say, okay, what should the court have done with this language? The court found it was so clear that it did not consider extrinsic evidence of a great moment. How is the court wrong, and how does the language of the contract that's before the court, not what was done in the City of Los Angeles contract, but what's in your contract? Okay, I'll start with saying that I believe that the language in this contract is functionally equivalent with more words than that in the City of Los Angeles. You picked functional equivalent up from the prior case, right? I didn't, but I will glom onto it now. The similarities are this, and the key points of the agreement here in this particular contract is that there is a recitation and a confirmation that there is a construction loan made by West America. There is an unequivocal promise that within that loan commitment, within the budget of that loan, within the line items of the budget of that loan, that West America agreed to establish the funds necessary to pay the costs of the required improvements. It doesn't define what required improvements are, but the purpose of this set-aside agreement in the industry is to provide a promise of funding available for bonded improvements, so if there's any ambiguity created in that term, then that should be construed against West America, who drafted this without negotiation. The set-aside promise to establish funds necessary was subject to an irrevocable commitment of funds, not subject to recall after the loan was made. It was permanent, so whether or not there was a borrower default on the loan, this is an irrevocable commitment to fund these items. There is extrinsic evidence in the form of testimony from the loan officer of the bank who said that this irrevocable commitment meant that funds could not be transferred to some other purposes, i.e., in the specific instance we're dealing with in this case, the well work. Those funds should not have been transferred or dispersed for a purpose other than the del seco of the loan officer. Another key component of this set-aside promise is there's no right to offset. The bank has no right to offset. It also recites that the monies will be dispersed according to the scheduled payments in the construction loan agreement. Yes. Now, I'd like, can you focus on that, because Exhibit A to the loan agreement has, does not specify, well, you tell me where in Exhibit A it gives guidance to the disbursement on this subject. The Exhibit A actually lays out the budgeted line items of the set-aside funds and the public improvements that are bonded by the Hartford. It doesn't specifically state when things were going to be dispersed, but what the reference in the set-aside to the construction loan agreement and the schedule of payments in the construction loan agreement, which matches the Schedule A as it relates to the Hartford bonded work. That signals, signaled that this loan agreement is going to be formed part of this transaction, this customary transaction for a set-aside security fund for the surety who has agreed to provide bonds that will benefit West America's collateral, benefit the borrower. And the only promise in return is that the funds that the bank has already budgeted will be applied to the work that Hartford has. Okay, but wasn't, wasn't the purpose of the agreement to give Hartford the right to collect all remaining funds from West America upon written notification in the event that the developer defaulted on its obligations to Hartford? That was the purpose, right? No, that's one purpose. The other purpose is to establish the funds necessary to pay for the required improvements. That commitment to set aside that funding, in fact, there's reference in the set-aside agreement to an account that after the default, all funds remaining in the separate account will be made available to Hartford to pay for, to diligently complete and pay for the cost of the improvements. Now, there's reference to separate accounts, so we've got another reference creating a necessary to pay for the work. That's the commitment that's being made in this, in addition to turning over funds. Is there a specific provision in the loan agreement that requires West America to ensure that work is done before they disperse the funds? Yes. And what language are you relying on for that proposition? In the loan agreement itself, Your Honors, I will have to find that on, while I'm waiting for rebuttal. But I do, there are specific provisions in the record that confirm that the payments under the loan agreement are going to be made on a percentage of completion basis. I believe it's on, it's one of the exhibits to the loan agreement. That there's also the loan agreement provision. Are you talking about the provision that indicates that PMDG shall apply for disbursement with regard to work actually done by the general contractor? You're talking about that particular provision? There are also provisions, actual conditions on dispersal in the loan agreement itself. The one that... But you're not a party to the loan agreement. That is true. But it is an industry standard loan agreement that follows and protects the bank from the risk of default, which is an interest that both parties are aligned on. So even though the contract doesn't say it, you're just saying that there's an industry standard that that's how it's supposed to work. And they should have been more, when they said that something was 75% done and they dispersed the funds, they had a, you're saying even though you weren't a party to that contract that they had a duty to you to make sure that it was that much done. In part... And save the money for you that you had a separate contract with someone agreeing to ensure that that was done. If I understand correctly, there has been case law that found that there is a reasonable standard of care, the commercial standard insurance case, which is cited in our papers, whereby it's recognized that a bank in dispersing construction loan funds, when it knows there's a surety involved, is subject to a standard of care to diligently and properly conduct the dispersals to match progress on the project. In part, both parties have an aligned interest here and they both knew it. The bank doesn't want to pay in advance for work that's not done because it increases the risk of their loss on the project. Similarly, the surety expected that this commitment of funds necessary would be set aside to fund the specific line items only for the work that had been done. Can I get a clarification then? I asked you to look at it or talk about it and look at Exhibit A. I noticed that on it, it has a little series of projects. All the projects except the water well building have phases. Is there any record, any evidence in the record to indicate how disbursements were made against those phases? Were they made in time to the completion of a phase? Because you said in the loan agreement there's a percentage of completion that proviso. Is that tied to Schedule or Exhibit A? The Schedule A actually identifies the various line items that comprise what's been defined here as the public improvements that are bonded. No, I understand that, but it talks about phases. So I'm familiar, you know, from a remodeling contract, the percentage of completion. You make periodic payments, but they have to be tied to certain phases or milestones achieved. I'm just asking, is there any evidence in the record that the parties treated phase completion as a milestone against which these numbers would be disbursed? There's nothing in the record, nor was this a milestone type project in that sense. So I'd like to reserve my remaining time, Your Honor. If it please the Court, Richard Murray for West America Bank. I'd like first, Your Honors, to address the issue that was raised in the order that was issued recently concerning the District Court's proper, or improper, delegation. Yeah, so why shouldn't the panel, since we, when we sit in diversity and we have to apply, you know, state court, why shouldn't the panel apply Murray and reverse the District Court? Well first off, Murray did not involve a situation where the Court had failed to consider the extremes of evidence. Actually, in that case, they had considered it, and Murray kind of gratuitously says, well, it would have been reversible error if they had not. It cites to the PG&E versus Thomas Dreyage case, which was actually cited in the bank's motion to the District Court. And that case, there's a couple points I'd like to make about that. First off, that case deals with the concept of exclusion of extrinsic evidence, and that that's a reversible error. Well here, no evidence was excluded by the District Court. He actually referred to the various declarations, and he said there's, you know, been objections to all of those, but I'm overruling all of those objections. And I've considered them, and I'm allowing them in. So there's been no exclusion of extrinsic evidence first. Secondly, the other point that Thomas Dreyage makes is that the concept of extrinsic evidence being proper is that it has to be proposed for a proper purpose. And a proper purpose in contract interpretation involves pointing to specific language of the contract, which the extrinsic evidence shows is susceptible to multiple meanings. And so the various cases that we've looked at, I think the Pacific Gas and Electric case, let's see, the Moray case, I believe, was dealing with the affiliated entities language, and there was extrinsic evidence as to what is an affiliated entity. The PG&E case dealt with the concept of indemnity. What does the language indemnity mean? And clearly that has multiple meanings. And so extrinsic evidence was proper to determine how did the parties mean indemnity within the context of this agreement. Here... Well, is Moray even still good law, or has Doar overruled it? Because they didn't apply the Moray reasoning, and I don't know if you say Doar or Dorey or whatever. Yeah, Dorey. Well, I don't know that Dorey certainly did not expressly overrule it. And it dealt with really the same concept that there the language of the agreement said at will, and they were trying to determine based on extrinsic evidence, does at will include for cause or not for cause. And in fact, I think in the court there really said that we almost don't even need to get to extrinsic evidence because it's so obvious. So they kind of almost backtracked on that rule. But the point I'd like the court to consider here is that Hartford hasn't provided any that says a specific term in the set-aside letter means something other than what it appears to mean on the face of it. They haven't... What should they have said to make it clear as to what, you know, they apparently think that the bank should have made sure that everything was completed when they put the money out. So, and if they had done that, there'd be some money left for them to get right now. Right. I think the answer... What should it have said? It should have said exactly what Hartford's form of agreement says that the bank testified they rejected. The Hartford form says that you disperse to the contractors performing the work. So you're dispersing directly to contractors who are performing. And after approval by the architect, the engineer, or the obligee, which would be the city in this case because they're the obligee of the bond, who are the parties whose job, architect, engineer, city, their job is to determine that work is being performed in accordance with the plans and specification. And you do that in conformance with your standard loan construction procedures. Now, they didn't say any of that here. They substituted directly dispersing to the borrower instead of to the contractor on the borrower's order. Now, order, that's not a conditional word. That's a directive. The borrower says, pay me money, you pay money. And there's no provision for approval by any third party. And the bank, of course, perhaps realized in drafting this that if you take these three parties, architect, engineer, and city out of the approval process, then it might be think that somehow the bank is going to be going to be doing this. But what does the bank say? We are not responsible to determine or ensure that the improvements are properly completed, nor are we responsible to determine that the improvements have an adequate budget so that you even have enough money here to complete the improvements. And that was very important for the following reason. Hartford makes a lot of noise about the fact that the bank dispersed this well work funds without reviewing the plans and specifications because the plans and specifications didn't exist. Well, Hartford issued a bond to the city of Gridley saying, we guarantee that we will complete these this well work, even though there were no plans and specifications in existence. So Hartford signing this blank check that they're going to do whatever the city of Gridley may someday decide plans and specifications that don't exist now require. And the bank certainly wasn't going to take on that responsibility. That's why they say, hey, if that's not enough money here, that's not our problem. If they're not done properly, that's not our problem. Because how could we determine it's done properly if there's not even any plans and specifications in existence? Yeah. Well, I have a question about that language because in the set aside agreement, it says that the bank undertakes no obligation to determine or ensure one, that such improvements have been properly completed. Now, that could be read two ways. It depends on whether the emphasis is on properly or it's on completed. The implication of one reading is there's no obligation to determine whether the completion of the project has been done properly in terms of workmanship and the like, or it could mean that it has, in fact, been completed at all. And the second, because it goes on to say, including without limitation to matters of which would seem to be saying that the properly completed simply means upon completion, they don't have to warrant that the workmanship and the like have been and anything having to do with proper completion. And then the second, it goes on to say, and two, that the earmarked amount is sufficient to complete the improvement. I'm not sure how complete in that clause works, but it does, they seem to imply that completion is a relevant concept to the payment of monies out of this, pursuant to the set aside agreement. Right, Your Honor. And I would say that the reason that it's relevant is because of the context in which the agreement is entered into, where there are no plans and specifications for this well work, so you really can't determine that. You have to remember also that this is very different. But we're in a contract interpretation case, and the question is, is that sufficient ambiguity? You're saying, well, even assuming it was sufficiently ambiguous to warrant considering an extrinsic evidence, the district court did hear the extrinsic evidence. That's correct, Your Honor. And part of the extrinsic evidence was that the bank had already dispersed 60 percent of the funds before Hartford came on the scene. This loan was made back in January of 05, and Hartford doesn't show up until August. And so, of all the set aside funds that are listed on that Exhibit A, 60 percent of those were already dispersed before the agreement was signed. So this is not your typical situation, where the surety is there from day one. Well, I don't understand how that's relevant. Because if your obligation is to disperse what funds are under your control, you still have to disperse it at the right time in the process, whatever has gone on before. That's why I was asking about the phases that show up, because if there was some history, but apparently it's not in the record, of how disbursements were timed in the prior disbursements, because if there was a pattern that they only got dispersed when a phase was completed, then that wouldn't help you very much. No, and there's certainly no pattern of that, but there is history that's relevant, and that is that the way that the bank had dispersed the prior 60 percent was in one single disbursement after getting a report from CIS, their inspector. And the inspector goes out and says, I've looked at the project, and this item is 10 percent complete, and this item is 50 percent complete, and this item is 30 percent complete. And that report was provided to Hartford before they entered into this agreement. So again, if you look, and the Thomas Dreyage case says that the court needs to look at the circumstances surrounding entry into the contract to put themselves in the position of the parties, and if you do that, you see that the position of the parties was it was very clear that the way the bank was going to do this was going to have CIS go out and tell them it's X percentage complete, and then they're going to issue a check based on that. And that's exactly what happened with regard to the well work. Now, counsel also makes arguments. Let me make sure I understand your arguments. You said that had been the history of how funds were dispersed prior to Hartford coming onto the scene, and the same is true with regard to the final payment that exhausted all of the funds, essentially. The inspector for West Marigold went out there, did some cursory inspection, came back and said, looks like a certain percentage was done. The borrower demanded the money, and West America dispersed it. Correct. Did Hartford, once they became involved, take any steps to protect their own interests, for example, sending out their own inspectors before funds were dispersed or have continuing communications with West America about how these funds were to be dispersed? There's nothing in the record to indicate that they ever had any communications with West America Bank before, during, or after. I think the first communication we got was when they made a demand on us to disperse the funds a couple of years later after the borrower defaulted. And there's certainly no... Can you hear my voice? Oh, and there's nothing in the record to indicate that they did anything to protect their interests at all, including to even figure out that there weren't plans and specifications in existence for the well work that they were writing a blank check to the city of Gridley that they would complete. The... A couple of minutes left here. The other claim raised in this is a conversion claim, and I just wanted to mention that it's true that the conversion claim, I think, falls if the breach of contract claim is denied. But Hartford, I think, suggests in their reply brief that perhaps the conversion claim stands on its own and cites the two cases in their reply brief, one is a Hartford case and the other one is an unpublished decision, Gulf Insurance. And those two cases actually support West America's position. The Hartford case that it's cited to in the reply brief deals with Hartford as a secured party, it's not a set-aside letter, they're a secured party on some equipment. And what the court says there is that, yes, you can have a conversion claim as a secured party if your security agreement provides that you have a right to possession of collateral after default. It did in that case, and so they had a conversion claim. Well, that's not all that different than our situation. The set-aside letter says, yeah, you have the right to possession of this money to the extent we are still holding it after there's a default by the borrower and you give us a demand. The problem with Hartford's claim is that they didn't make a demand until, in fact, the borrower didn't default until a long period of time after all of the money had been dispersed. So there's just no basis for their conversion claim at all. And the Gulf Insurance case is interesting because it involves a situation that this isn't, which is where the bank still is holding undisbursed funds for the set-aside letter and refuses to turn them over saying, well, now the borrower has defaulted and we have no obligation to give this money to the borrower. Therefore, we don't have any obligation to give it to you, the surety. And the court says, no, the point of this set-aside letter is that, in fact, after the borrower has defaulted and generally there is no obligation to disperse funds, the surety can still come to you and say, hey, if you're holding money, we're entitled to get it so we can go complete those improvements. Of course, they were too late by the time they did that. That money was already long gone and had been spent by the bank. And this is the other point, is that, you know, there's no dispute of fact here that more well work was completed by contractors dollar-wise than was dispersed by the bank. It's only a timing issue. So when the bank dispersed the $255,000 in April of 2006, the well had already been dug. I mean, that's why the inspector went out there and he said, oh, there's a well. Now, what happened is that subsequently another contractor came in and did a bunch more work so that the total of those two far exceed the disbursement by the bank, but the problem is the borrower didn't pay the second guy. He paid the first guy, but he didn't pay the second contractor. And so we fall directly under the language of the set-aside agreement again where the bank says, hey, we're not responsible for the misuse of these funds by the borrower. We pay these funds to the borrower on their order and what they do with them is Hartford's risk, not the bank's risk. And that's, I think, the complete answer to this case even if the court were to find that there is some basis for saying that should have considered something else here. Ultimately, it doesn't matter because the bank has no responsibility to Hartford for PMP's misuse of funds. And that's exactly what this case is about because had PMP paid that bill, clearly Hartford would have no claim against the bank. The bank doesn't have any money. Money was dispersed. It went to pay contractors who performed work. The only thing is that it didn't get paid. All right. Thank you. Thank you. All right. To first answer the question about where in the construction loan agreement the disbursement requirements are and the requirements for having the work be completed first, first found in its document 34-8, page 29. There is a provision titled disbursement of loan funds. And that requires a standard AIA payment request form with a certification be submitted. And it states borrowers shall only apply for disbursement with respect to work actually done by the general contractor. Right, that was the provision by reference. I wondered if you had any other language because arguably that provision places the burden on the borrower to apply for completed work. But it doesn't necessarily place the burden on West America to ensure that work was done. So if there was another provision that you wanted us to look at. There is a proposition and you can point me to that. As part of exhibit B, the construction covenants, there's also a statement that the method of disbursement of loan funds is on a line item basis. Now, the importance of the disbursement provision that we first looked at and the AIA payment form is important because that payment form contains a certification that I, contractor, have done the work and I, architect, have approved that this work has been done. That was not done here. West America actually wrote an email asking the borrower how much money they wanted. They then told their inspector, hey, here's the budget available, go tell us what's done. And admittedly, they did that without having the plans. There was no contract for this well work that had been let at that time. The simply work wasn't done and any reasonable person who actually observed that would have known that. They simply failed in their obligation to set aside funds. Which that inspection was much different than the prior ones that had gone on in the project. That one was a cursory one hour review where the inspector admittedly went out, inspected the work done without having the plans. He took pictures, his very short report had no evidence of what actually had been completed as of that time. So, the actual breach is the bank releasing the funds that it had promised that would be set aside for the required improvements. It's functional act was not to set them aside by telling the borrower, hey, you can have whatever you want. I'll tell my inspector to go look at it. The work wasn't done. They should have known that. And I want to go back to one last point and that is, had the court looked at the extrinsic evidence and considered the testimony of the experts as to the meaning of the set aside letter. He would have seen the intent and the whole purpose of the set aside letter was as the language in it says, is to create a separate and identifiable fund specifically for this work. And that it would only be paid for this work. And that's just consistent with the city of Los Angeles case, despite the slight differences in wordings. All right. Thank you, counsel. We appreciate the arguments and the cases submitted.
judges: Fisher, Callahan, Nguyen